UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.

EDWARD MILLER,

Defendant.

**26-cr-83 (SVN)**

# DEFENSE SENTENCING MEMORANDUM ON BEHALF OF EDWARD MILLER

By: */s/ Stanley A. Twardy, Jr.*
Stanley A. Twardy, Jr. (ct05096)
Day Pitney LLP
One Stamford Plaza, 7th Floor
263 Tresser Boulevard
Stamford, CT 06901
(203) 977-7300
satwardy@daypitney.com

Gedalia M. Stern (ct31314)
NechelesLaw LLP
1120 6th Ave, 4th Floor
New York, NY 10036
(212) 997-7400
gstern@necheleslaw.com

October 23, 2026

## INTRODUCTION

We respectfully submit this sentencing memorandum on behalf of Edward Miller.

Edward Miller, who is called Ed or Eddie, pleaded guilty to a single-count Information, charging him embezzling money from a trust he was managing, in violation of 18 U.S.C. § 1343. Mr. Miller has admitted that from 2016 through 2022, he wrongfully took approximately $500,000 from a trust for which he was the trustee.

Mr. Miller has accepted responsibility for his wrongdoing. As Mr. Miller writes in his letter, there "is no justification for taking funds out of a trust account and transferring them to myself. … There are no excuses." Edward Miller Letter.[1] He also recognizes that he "betrayed th[e] trust" that was placed in him and acted like "a selfish person who fed off of good people." *Id.* In this Memorandum, therefore, we do not excuse Mr. Miller's conduct, but rather explain why, given his full restitution, his age and medical conditions, as well as the serious collateral consequences he will suffer from his crime—including losing his law license and, almost assuredly, his house—an incarceratory sentence is not necessary.

Ultimately, in considering Mr. Miller's conduct and deciding on his punishment, we respectfully request that the Court bear in mind the exhortation from the Second Circuit that "a sentencing judge must have some understanding of the diverse frailties of humankind." *United States v. Singh*, 877 F.3d 107, 121 (2d

[1] Mr. Miller's letter was submitted to Probation and is included in full in paragraph 18 of the PSR.

Cir. 2017) (internal quotation marks omitted). Moreover, because there is "no burden more onerous than imposing sentence in criminal cases," a "sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain," as well as "a kind and understanding heart." *Id.*

## I. HISTORY AND CHARACTERISTICS OF MR. MILLER

### A. Mr. Miller's Upbringing and Family Life

Mr. Miller was born in 1955, as the middle of three boys, to Arthur and Edith Miller. His father was a WWII pilot who, after the war, ran a meat market to support the family. While Mr. Miller had a good relationship with his father, his relationship with his mother was much more strained. Mr. Miller believes his mother suffered from undiagnosed mental health issues, which often made her erratic and angry. *See* Edward Miller Letter ("My mother had outbursts of rage for no reason."). As a child, Mr. Miller was often scared of his mother. PSR ¶42.

Notwithstanding these issues, Mr. Miller was "relatively happy" until around the 9th grade. Edward Miller Letter. Around that time, Mr. Miller began "experiencing emotional ups and downs," with the lows bringing "excruciating feelings of hopelessness, loneliness, and panic." *Id.*[2] To "find relief from the pain," he started drinking and smoking marijuana. *Id.*; *accord* PSR ¶¶63-64. Although he was

---

[2] This was not unusual, as mental health conditions, including [redacted] often manifest in the teens and early twenties. *See* [redacted] - Symptoms and causes - Mayo Clinic ("[redacted] can start at any age, but usually it's diagnosed in the teenage years or early 20s.").

not diagnosed until years later, Mr. Miller was [redacted]

Given his condition, Mr. Miller struggled with consistency and staying put, and over the decade after he turned 15, "moved from city to city—only once staying in the same city for more than a year." Edward Miller Letter. After spending a summer in Israel, he decided to become religious and transferred to a religious high school (a *yeshiva*) in Queens before transferring again to a different yeshiva in Baltimore. PSR ¶48. He started college at Brandeis, before transferring to, and receiving his degree from, the University of Michigan. Over the next few years, before starting law school, Mr. Miller spent time in Morocco, Tunisia, Israel, New York, and Connecticut. *Id.* In 1979, Mr. Miller started law school at the University of Connecticut School of Law, from where he received his J.D in 1982 (although he did his 3L year at NYU).

In 1982, as Mr. Miller was finishing law school, he met and married Susan Berkovits. Together, they have two sons, Yacov, who is 41 and lives in Florida, and Pierre (or Chaim, as he is called in Hebrew), who is 36 and lives in Long Island. The marriage has "had some good times but also ha[s] been full of turmoil." Susan Miller Letter, Ex. A.

Susan Miller's mother was a survivor of Auschwitz, and her father spent three years in a prison camp in Siberia. Given her background, she [redacted]

[redacted]

Unfortunately, while Mr. Miller has many excellent qualities, providing stability is not one of them. Mrs. Miller describes their married life as follows: "the [redacted] *Id.* Through it all, Mrs. Miller felt like she [redacted] As Mr. Miller acknowledges, his "difficulty maintaining steady employment," as well as "his struggles with mental health and substance abuse" have put a real strain on their marriage. PSR ¶52.

The Millers also struggled dealing with their [redacted] Susan Miller Letter, Ex. A. Their relationship with him is still strained. PSR ¶55. Mr. Miller's relationship with his younger son, Pierre, is much closer, although far from perfect. As Pierre writes in his letter, "growing up was frustrating, because there were truly amazing times with my father, times when he was literally the only person who understood me, alongside times of tremendous hurt and

disappointment." Ex. L. On the one hand, his father understood "in ways that very few people did," that although he had learning disabilities, he "had other talents," such as "[m]usic, dancing, art," and his father "encouraged all of it." On the other, his "father struggled with alcoholism and his mental health," and there "were terrible fights at home, times when he came home drunk, and many times when he simply wasn't present for us in the way we needed him to be." *Id.* Over the last several years, as Mr. Miller has recovered his sobriety, and started [redacted] the relationship has become loving and caring. *See id.* ("For the first time in my life, I watched my father seriously confront his alcoholism [redacted]. … I hoped that one day I would have the relationship with him that I had always wanted. And now, after everything, I finally do."). Mr. Miller is now "involved in [his son's] professional life," and has "become someone my mother can lean on." It is Pierre's "greatest joy" that he "finally ha[s] a father."

He is also a loving and doting grandfather to his three grandchildren. *See id.* ("And I cannot begin to describe the grandfather he has become. He learns with my son, plays with him, and takes him on Thursday nights to deliver food packages to poor families. He wants to teach him what life is really about."). *See also* David Taub Letter, Ex. F ("When Edward is with his grandchildren, he lights up. Despite his age, he gets down on their level, plays with them, runs around with them, laughs with them, and gives them his full attention. … Their love for him is deep,

natural, and obvious. They seek him out, enjoy being around him, and clearly feel safe and cherished in his presence.”).

B. Mr. Miller as a Lawyer

After law school, Mr. Miller moved to Cleveland to work at the boutique labor and employment law firm of Duvin, Flinker & Cahn. Within about a year, he lost that job. *See* Susan Miller Letter, Ex. A (“And within just under one year Ed got put on probation at his job. Then, a few months later Ed got fired.”); PSR ¶ 81. For a few months after that, Mr. Miller was unemployed and his wife and he “had to pretend Ed had a job.” *Id.* The next year, he got a job at Benesch, Friedlander, a well-regarded Midwestern firm, but again lasted there only around one year. *Id.* Unable to get another job with a firm, Mr. Miller became a solo practitioner, which, with the exception of the occasional partner, was what he was for the remainder of his career.

Mr. Miller’s career was usually “feast or famine.” Edward Miller Letter. “Every few years,” he would “get a big win in a trial,” and the “money would go to paying off debt, with the rest covering future expenses for a year or less.” *Id.* In 1992, using his proceeds from “a jury trial [he] won” on behalf of an employee terminated due to racial animus, Mr. Miller and his wife decided to move to New York. *Id.*

Over his career, Mr. Miller focused on labor law, employment law, and civil rights law. *See* Joshua Dann Letter, Ex. P (“He told me he was going into plaintiffs’ labor law. This was hardly surprising, as it was the ultimate expression of his

concern for the little guy."). Mr. Miller was a dedicated and talented lawyer, particularly when he was not drinking heavily. Dale Naticchia, a Cleveland-based lawyer, writes about the time he and Mr. Miller litigated a case under the then-recently enacted American with Disabilities Act. Mr. Miller "was very compassionate about representing victims of institutional systemic abuses," and he and Mr. Naticchia "worked tirelessly putting in long hours." Ex. B. Although the "defendant corporation was represented by one of the largest law firms in Ohio" they "achieved a significant settlement in that case by taking it right up to trial and showing the other side that we were not afraid to try it." *Id.* After that initial success, Mr. Miller and he "co-counseled many cases representing victims of systemic abuse by large entities whether they be a corporation, international union, police department, insurance company, bank, university or employer." Mr. Naticchia describes Mr. Miller as someone "who believed [h]e could make a difference in [his] clients' lives," and was "driven by compassion for [his] clients." *Id.*

Robert Herbst is another lawyer who years later worked together with Mr. Miller "on several cases, most notably a month-long trial in Bergen County, New Jersey in a difficult age discrimination case." Ex. Q. He described Mr. Miller as "a really good lawyer" who "cared deeply about his clients and worked very hard on their behalf," and for whom "the practice of law … was a calling, not a business." *Id.*

Mr. Miller also tried to help younger lawyers who were just beginning their careers. Eliot Blumenthal was "searching for a job for several months" after graduating from law school. Ex. C. Mr. Miller, "took an interest in my career and

when he saw that I was having difficulty finding a job" he hired him "to work with him on a large Robinson Patman Act Antitrust case then pending in the Southern District of New York in which he was co-counsel for the plaintiffs." Mr. Blumenthal "knew nothing about antitrust law, or anything for that matter, but Ed spent time with me teaching me the law and teaching me the basics of discovery." *Id.* Mr. Miller also introduced him to his co-counsel, who eventually hired Mr. Blumenthal, which set him up for a successful career. Mr. Blumenthal writes that "[a]ll of this is thanks to Ed Miller," because without "him giving me my start, I would never have gotten the experience that has allowed me to go out on my own and have a successful career." Moreover, Mr. Blumenthal writes that he "know[s] of at least two other lawyers in the neighborhood who got their starts with Ed and went on to have successful careers that were built off of the experience and networking that came from Ed giving them opportunities." *Id.*

### C. Mr. Miller's Passion for Improving Jewish-Muslim Relations

Already as a young man, Mr. Miller was "wrestling with issues well outside of the typical purview of an 18 year old. He thought deeply about the world," and had a "strong sense of idealism and duty to do something to heal the world." Barney Linn Letter, Ex. R. *See also* Joshua Dann Letter, Ex. P (describing how Mr. Miller, while in high school, "organized a school-wide fundraising drive where we rang doorbells and solicited donations for starving Biafrans and later for Mississippi flood victims."). In particular, he has long had a passion for improving relations between the Jewish and Muslim worlds. *See* Robert Herbst Letter, Ex. Q ("Ed was

passionately interested in helping to bring about a rapprochement between Jews and Muslims in the Middle East, and particularly in Israel-Palestine."). After graduating college, for example, he travelled to Morocco, Tunisia, and Israel "in conjunction with his involvement in the World Organization of Jews from Arab Countries." PSR ¶49. He also reached out to leaders and scholars from both of these communities. *See* Robert Herbst Letter, Ex. Q ("We once went up to Bard College so that Ed could introduce me to a visiting professor there whose family went back centuries in East Jerusalem, and who was one of the foremost experts on Al Aqsa and the Dome of the Rock."); Carmi Schwartz Letter, Ex. K ("Ed was one of the few people who I have met and got to know personally who had an interest in Islam-Jewish relations. … [He] t[ook] a real interest in my experiences. He would ask me probing questions about every aspect of recent Jewish history and the personalities involved in making it.").

Eventually, Mr. Miller wrote and published a book called Vision of Abraham, The Intertwined Stories of Islam and Judaism Told Through Images (2005). The first chapter of that book is attached as Ex. W. The book, designed for adults but accessible to young adults, describes the connections and similarities between Judaism and Islam, in the hope that the broader recognition of that shared history could help improve Muslim-Jewish relations. *See* Carmi Schwartz Letter, Ex. K ("Ed published a wonderful book about twenty years ago which laid out the close relationship between Judaism and Islam on all levels."). Mr. Miller, who is working on a second book on a similar topic, *see* PSR ¶74, also worked to develop "significant

relationships with Palestinian Arabs, both Muslim and Christian," and "was devoted to advancing the cause of peace in that disputed land." Robert Herbst Letter, Ex. Q; *accord* Carmi Schwartz Letter, Ex. K ("He is driven by a desire to find ways to bridge the gap and convert religion into a source for peace rather than a weapon of war.").

D. Mr. Miller's Mental Health and Struggle with Alcoholism

As mentioned briefly above, from the time Mr. Miller was a teenager, he has struggled with his [redacted] *See* PSR ¶¶42, 55 [redacted]; Susan Miller's Letter, Ex. A [redacted]; Edward Miller Letter [redacted]. Eventually, Mr. Miller [redacted]. PSR ¶70; *accord* Dr. Gupta Letter, Ex. Z. This condition was only exacerbated by Mr. Miller's abuse of alcohol and, at times, drugs.

As described by his wife, Mr. Miller "was always up and down, full of energy and optimism, or so depressed he radiated sorrow. Seldom in between." Ex. A; *accord id.* (describing her husband's "emotional ups and downs that made life so unpredictable"). Others describe him in similar ways. Barney Linn, who met Mr. Miller when they were both college freshman, writes of his "extremes of commitment," and how they "would have a blast doing something or other for a few days and then he would go missing for a while." Ex. R. They would have conversations "characterized by nearly raging intensity," and Mr. Miller's "mind would just go and go until it was twisted-tight and exhausted." *Id.* Similarly, Dale Naticchia, who worked with Mr. Miller in the 1980's, describes the "changes in Ed's

behavior. Some days he would be full of energy and optimism and on others I could barely get him to engage in conversation." Ex. B. Eventually, Mr. Miller "drifted away," and "seemed to be very sad sometimes." *Id. See also* Hayden Miller Letter, Ex. U ("Even as a young man, I could tell that my uncle carried a heavy sadness that was difficult to explain or understand. … I recall seeing him at joyous events, family weddings and bar mitzvahs among them, and feeling that there was something weighing on him.").

Over the years, Mr. Miller occasionally [redacted] he would stop going to them after "a few sessions." Edward Miller Letter. Instead, looking to quiet the "noise," he would abuse alcohol and marijuana. *See* PSR ¶63; Susan Miller Letter, Ex. A (describing "the drunken fighting"); Pierre Miller Letter, Ex. L (describing the "times when [his father] came home drunk"); Dale Naticchia Letter, Ex. B ("I also saw that his drinking was becoming progressively more prevalent."). This drinking only further exacerbated [redacted]. *See* [redacted] and alcohol: It's not as simple as 'self-medication' | Michigan Medicine ("Our study shows that when an individual [redacted] drinks more than typical for them … they are more likely to show an increase in depressive and/or manic symptoms over the following six months[.]").

From his teens until his mid-40's, Mr. Miller was an alcoholic. Then, starting in the late 1990's, Mr. Miller attended AA and stayed sober for approximately a decade. PSR ¶65. It was during this period that Mr. Miller wrote his book.

Unfortunately, after that decade of sobriety, he fell off the wagon and started abusing alcohol again. Thankfully, as we discuss further, *infra*, Sec. IV.C, he stopped drinking in December 2022, when he re-joined AA, and has been sober since then.

## II. THE CHARGED CONDUCT

Mr. Miller has admitted that he embezzled around $500,000 dollars from a trust he was managing. He recognizes that there are "no excuses for what [he] did," and admits that he "knew that what [he] was doing was wrong." Edward Miller Letter. Thus, we do not seek to excuse Mr. Miller's conduct, but "merely … to explain" how and "why he broke the law." *Singh*, 877 F.3d at 120 (2d. Cir. 2017) (emphasis removed).

Mr. Miller was the trustee of a trust established by Marion Pinsly, a cousin of Mr. Miller's father, for the purpose of managing real property she owned in Connecticut. Mr. Miller was entrusted with depositing rental income into the trust account, paying property management costs, overseeing the maintenance of the building, and distributing funds to Ms. Pinsly as the trust's beneficiary. PSR ¶8. As remuneration for his work, Mr. Miller received 5% of the monthly rent and certain additional commissions. *Id.*

In early 2016, around a year after he became trustee, Mr. Miller, as was often the case, was struggling financially. So he did something he knew he absolutely should not have: he began to take small sums from the trust to which he was not entitled. For the first few months, he often re-paid significant portions of what he

took within a relatively short time frame. Then, in early 2017, he and his wife bought a new home in Long Island, which was purportedly in move-in condition, but which, unbeknownst to the Millers, actually required major structural renovations. *See* Susan Miller Letter, Ex. A ("In 2017, we had purchased a home which we thought was in move in condition but was actually full of wood rot from water. The house had to be rebuilt from the inside out at tremendous cost."); Edward Miller Letter ("However, the house was so water damaged that it had to be rebuilt from the inside out. The water caused wood rot was so severe that we had to install a 20-by-20 metal T-bar in the ceiling in the middle of the house to prevent the house from collapsing."). This created extraordinary financial stress and Mr. Miller, to his great shame, responded by taking larger sums from the trust, and only occasionally paying some of it back.

To make matters worse, in 2019, Mr. Miller suffered a massive stroke. He spent one month in the hospital and then an additional ten months receiving outpatient rehab. PSR ¶59. Mr. Miller was unable to work for nearly a year, and when he was ready to get back to work, he had no practice to return to, as his partner had left and started his own practice while Mr. Miller was recuperating. Edward Miller Letter. For the next few years, Mr. Miller struggled to find consistent work and worked, when he could, as of-counsel for other lawyers. *Id.* During this time, Mr. Miller continued to embezzle money from the trust.

In total, from 2016 to 2022, Mr. Miller took $509,372 to which he was not entitled.[3] At the time, Mr. Miller "justified" what he was doing to himself "by thinking that [he] would repay the estate" from funds from his next legal settlement. Edward Miller Letter. Of course, he knows "that is no justification for taking funds out of a trust account and transferring them to myself. That is stealing regardless of my hopes. That is the definition of embezzlement. There are no excuses." *Id.* Finally, in addition to the money Mr. Miller personally stole from the trust, he also negligently oversaw some disbursements from the trust, albeit without any criminal intent, which allowed another family member, Jimmy Pinsly, to himself misappropriate funds from the trust. *See* David Silberberg Letter, PSR ¶16. This conduct largely occurred after Mr. Miller's stroke.

In 2022, Marion Pinsley died and her son, David Silverberg, became the new trustee. At that point, Mr. Miller admitted to Mr. Silverberg that he had wrongfully taken hundreds of thousands of dollars from the trust. Due in part to his stroke, Mr. Miller was somewhat confused by how much he had taken and believed it was only around $400,000. During numerous conversations with Mr. Silverberg, Mr. Miller agreed to pay back what he had taken. Initially, Mr. Miller (overly optimistically) hoped that some of his pending cases, from before his stroke, would resolve successfully and he could use the substantial legal fees he hoped to receive from them to pay back the trust. *See* Susan Miller Letter, Ex. A ("Eddie is a dreamer;

---

[3] In total Mr. Miller took $984,978.25 from the trust and returned $347,548.20. This results, after deducting the $114,057.23 he was entitled to take as his management fee and a $14,000 payment he made from his personal account on behalf of the trust, to a total amount wrongfully taken of $509,372.82.

when he gets it into his mind that something big is going to happen, it becomes a reality to him."); David Silverberg Letter, PSR ¶16. Unfortunately, that did not happen, further deepening Mr. Miller's depression, and making him despair he could ever re-pay the trust. *See* PSR ¶ 70 (quoting Dr. Gupta's diagnosis of Mr. Miller as suffering from "post-stroke depression").

At that point, Mr. Miller's only asset was his home, although it was coming out of foreclosure. *See Metro City Bank v. Edward and Susan Miller*, Ind. No. 607645/2018 (Nassau County Supreme Court). Mr. Silverberg, understandably, wanted Mr. Miller to sell the house and pay the amount owed to the trust from the proceeds. However, [redacted]. *See* Transcript of Ed Miller Voicemail ("Voicemail Transcript"), dated May 29, 2024, attached as Ex. X[4] ("I cannot sell my house to you because I own only half of it and my wife is not hearing it. I told you she'd rather divorce me than to sell the house."); Susan Miller Letter, attached as Ex. A [redacted]. Mrs. Miller also did not want to allow [redacted] Ex. A. Mr. Miller, however, did offer, without the need for Mr. Silverberg to execute a settlement or

[4] This transcript was prepared by the defense of a voicemail recording of Mr. Miller provided in discovery. In the recording, Mr. Miller twice misspoke (as he often does post-stroke) and said "Jimmy" when he meant "David [Silverberg]."

release, to place a "judgment lien" on his half of the house to secure his debt to the trust, which would have allowed the trust to get its "money plus nine and a half percent interest when the house is sold." Voicemail Transcript, Ex. X. Mr. Silverberg, who understandably did not want to wait for an unknown number of years to get the trust's money back, declined this offer. Of course, Mr. Miller recognizes that this inability to re-pay the money he wrongfully took, notwithstanding his various hopes that he would be able to, is one of the reasons (albeit not the main one) why it was wrong to have taken the money in the first place.

Ultimately, in 2025, after the Millers were able to improve their credit somewhat, Mr. Miller was able to refinance his home, now finally with his wife's consent, and use the proceeds to re-pay the trust. At that time, as part of the settlement of a civil lawsuit Mr. Silverberg had brought, Mr. Miller paid the trust $685,000 which was intended to cover not only the funds wrongfully taken from the trust by Mr. Miller, but also any losses suffered by the trust, any accrued interest, and legal and professional fees incurred by the trust as a result of Mr. Miller's actions. PSR ¶¶13, 110. Mr. Miller is grateful to have re-paid the trust, although he recognizes that it does not erase what he did and that rectifying his crime is an "ongoing process that will last for the rest of [his] life." Edward Miller Letter.

## III. THE PLEA AGREEMENT AND GUIDELINE CALCULATION

In the plea agreement, under which Mr. Miller pleaded guilty, the Parties stipulated to the following Guideline calculation:

- 7 points is the Base Offense Level: §2B1.1(a)(1);
- A 12-point enhancement because the loss amount was $509,372.82: §2B1.1(b)(1)(G);
- A 2-point enhancement for abuse of position of private trust: §3B1.3;
- A 2-point reduction as Mr. Miller is a zero-point offender: §4C1.1;
- A 3-point reduction for acceptance of responsibility: §3E1.1; and so
- The Total Offense Level is 16, for a range of 21-27 months. The Probation Department concurs with this Guideline calculation. PSR ¶¶21-31.

Of course, in determining Ed's sentence, the Court must consider, in addition to the sentencing guidelines, the §3553(a) factors to arrive at a sentence that is "sufficient, but not greater than necessary" to achieve the goals of the federal sentencing regime. *See United States v. Jenkins,* 854 F.3d 181, 190 (2d Cir. 2017) (holding that "every Guidelines sentence is limited by § 3553(a)'s 'parsimony clause,' which instructs a district court to impose a sentence 'sufficient, but not greater than necessary' to achieve § 3553(a)(2)'s goals"). In fact, "a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court must make an individualized assessment based on the facts presented and the other statutory factors." *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (internal quotation marks omitted); *accord United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (holding that a "district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors.").

These fundamental post-*Booker* sentencing principles are especially important in the sentencing of fraud offenders because, as a number of courts have noted, the guidelines applicable to fraud and other like economic offenses, which give undue significance to dollar amounts, can often produce advisory sentencing ranges that are indisputably far "greater than necessary" and lack any common sense wisdom. *See, e.g., United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (complaining that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp.2d 506, 512 (S.D.N.Y. 2006) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"), *aff'd* 237 Fed. App'x 713 (2d Cir. 2008). In fact, the Second Circuit has held that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement,"—as is the case here—"that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016); *accord Kimbrough*, 552 U.S. at 101 (holding that sentencing courts "may vary from Guidelines ranges based solely on policy

considerations, including disagreements with the Guidelines") (internal brackets omitted).

Given both the state of the doctrine and the "lack of common sense" inherent in some of the fraud guidelines, it is not surprising that a majority of offenders sentenced nationally under §2B1.1 received below-guideline sentences. *See* U.S. Sentencing Commission, 2025 Sourcebook of Federal Sentencing Statistics tbl. 32 ("Sourcebook") (Only 1,974 of 4,803 § 2B1.1 offenders received within-guideline sentences); *id.* at tbl. 31 (Only 42.4% of offenders convicted of fraud-related offenses received within-guideline sentences). And this tendency is particularly notable in the Second Circuit and the District of Connecticut. *See* 2025 Second Circuit Statistical Information Packet, tbl. 10 (Only 26.2% of "Fraud/Theft/Embezzlement" offenders within the Second Circuit received within guideline sentences); *Sourcebook* at tbl. 30 (Only 21.2% of *all* offenders in the District of Connecticut received within-guideline sentences).

## IV. NUMEROUS MITIGATING FACTORS COUNSEL AGAINST AN INCARCERATORY SENTENCE IN THIS CASE

As discussed below, we submit that numerous mitigating factors and circumstances counsel against the need for an incarceratory sentence in this case.

### A. Mr. Miller is a Good Man Who Has Helped Many People

As discussed above, Mr. Miller stands before the Court convicted of a serious crime. But "an individual is more than the crime of which that individual has been" convicted. *United States v. Mattis*, 963 F.3d 285, 293 (2d Cir. 2020). It is therefore

the "longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual.'" *Concepcion v. United States*, 597 U.S. 481 (2022). *See also* 18 U.S.C. § 3553(a)(1) (requiring a sentencing court to consider "the history and characteristics of the defendant"). We therefore summarize below the letters describing the various ways Mr. Miller has helped people throughout his life.

For example, Samuel Stephan Naticchia, the son of a friend of Mr. Miller, [redacted], describes how Mr. Miller "began [redacted]" Ex. V. Subsequently, [redacted] *Id.* He writes that he is [redacted] *Id. See also* Dale Naticchia Letter, Ex. B (describing how Mr. Miller has "reached out [redacted].

Howard Kagan writes of the time Mr. Miller found the Kagans' son "in a school yard" after he "had swallowed many pills" in a suicide attempt and took him

to the hospital. Ex. E. Tragically, a few months later, their son did commit suicide, and Howard asked Mr. Miller to go "with the rabbi of our congregation to tell [his] wife about [their] son's death." *Id.* Mr. Miller greeted Howard when he "arrived back at JFK airport with his [son's] coffin." And when Michael Morgenstern's sister was "suddenly killed in a car accident," Mr. Miller went to pay a condolence call (called a *shiva* call in the Jewish community). Ex. I. Mr. Miller "sat down with me and my father. … He really didn't say much at all. He simply started crying. … I remember looking at him and being struck by how deeply he seemed to feel our loss. … For those moments, he was grieving with us." *Id. See also* Hayden Miller Letter, Ex. U ("Eddie reached out to me while I was in this state and was the only person who could get through to me that day and lift me from despair. … We spoke for nearly an hour, and I count it as one of the most important conversations of my life.").

Mr. Miller has also provided legal or other advice or assistance to many people over the years. For example, David Taub writes that Mr. Miller "has consistently made himself available to listen, share his experience, and help me approach challenges" with his business. Ex. F. And what "has always stood out is that Edward's concern did not end when the immediate conversation was over. He would remember what I had told him and later call" to follow up. "Those follow-up conversations made clear that he was not offering casual advice simply to be polite. He was personally invested in my success and well-being. He had nothing to gain from helping me; he did so because he genuinely cared and wanted to see me

succeed." *Id.* Similarly, Juda Klein tells of the time recently that he was "on trial in a commercial case in Connecticut," where he "was being sued for millions of dollars" which he describes as "one of the hardest times of my life." Ex. G. Mr. Miller "drove three hours each way to be with me, and he stayed in the courtroom with me the entire day for about eight hours," even though he was there "as a friend for support," not his lawyer. "He was the only person who came." *Id. See also* David Schachner Letter, Ex. S ("Shortly before Yom Kippur, I was struck by a car and suffered injuries. Knowing that I lived alone in a small apartment, Edward invited me to spend Yom Kippur at his home, where I would be more comfortable and cared for. Despite fasting himself, he repeatedly checked on my well-being throughout the day and made sure I had everything I needed."); Mark Shaingarten Letter, Ex. J ("[W]hen I was a very young adult and started to work, Mr. Miller had at the time an old car which wasn't very useful to him, he then gave it to me, just as a gesture, for me to gain independence, and get on my feet."); Carmi Schwartz Letter, Ex. K ("He cares about me, as he does about so many others. He asks about my wellbeing and that of my family. He has visited me when I was in the hospital more than once. Most recently, he visited me when I was in the hospital as a result of breaking my femur bone in my left leg.").

Finally, Jack Feig movingly writes how Mr. Miller has been an important source of support for him for nearly forty years. Jack was orphaned as a young boy and Mr. Miller "took [him] under his wing," and became "at different times, the big brother, uncle, friend, and even father figure I desperately needed." Ex. N. Mr.

Miller's kindness to Jack was crucial because unbeknownst to almost everyone, including Mr. Miller, [redacted] *Id.* Mr. Miller, however, helped him "feel happy again," and "reminded me that there was still joy in the world. He took me canoeing and sledding, out for ice cream and on long drives." Mr. Miller "became the adult in my life whom I could talk to, rely on, and trust." They were "simply friends." *Id.* Jack tells the Court that [redacted]. He writes that Mr. Miller's "kindness, consistency, and genuine care gave me a reason to believe in myself again. At a time when I desperately needed to know that I mattered to someone, Eddie showed me that I did." *Id.* Of course, none of Mr. Miller's good deeds excuse his conduct in this case. But those past good deeds, as well as Mr. Miller's potential to continue being a caring and generous member of the community, are important factors for the Court to consider when imposing its sentence. *See Adelson*, 441 F. Supp.2d at 513-514 ("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

B. Mr. Miller's Medical Conditions

Another factor we respectfully submit the Court should consider in fashioning Mr. Miller's sentence is the severe hardship a prison sentence would impose on him, given the condition of both his physical and mental health.

Mr. Miller had a [redacted]. *See* PSR ¶60. He later suffered a [redacted] Dr. Freilich Letter, Ex. Y; *accord* PSR ¶60. Dr. Freilich, Mr. Miller's cardiologist, believes that Mr. Miller [redacted] *Id.* Mr. Miller is also still dealing with [redacted] Edward Miller Letter; *accord* PSR ¶59.

In addition to these serious physical conditions, Mr. Miller is also taking [redacted]. *See* PSR ¶70; Dr. Gupta Letter, Ex. Z.

In all, given Mr. Miller's age and numerous medical conditions, a prison sentence would be unduly burdensome on both Mr. Miller and the BOP. *See*

*generally* 18 U.S.C. § 3553(a)(2)(D) ("The court, in determining the particular sentence to be imposed, shall consider … the need for the sentence imposed … to provide the defendant with needed … medical care").

C. Mr. Miller's Rehabilitation

Another important mitigating factor we submit the Court should consider is Mr. Miller's rehabilitation.

First, Mr. Miller, in addition to having made full restitution, has sincerely accepted responsibility for his actions and is committed to improving his life. He writes of the "painful realization[n]" of his "sense of entitlement" and believing that he "was entitled to do things others were not." Edward Miller Letter. He is "repulse[d]" by and "ashamed" of his past self. But he has worked hard to turn his life around and is committed to never re-offending. *See id.* ("I do not want to be that person. I was never meant to be that person.").

Mr. Miller's contrition is no mere lip service to the Court in the hope of leniency. Rather, numerous others have recognized how sorry and embarrassed he is over his conduct. *See, e.g.,* Barney Linn Letter, Ex. R ("Eddie told me what he had done" and "gave me the facts without so much as a single word of excuse or deflection of his responsibility. There was no 'woe is me.' He'd violated someone's sacred trust and gotten himself in trouble as a result. Simple as that. He had done wrong and he knew it and he owned it."); Dale Naticchia Letter, Ex. B ("I know he deeply regrets what he did."); Howard Kagan Letter, Ex. E ("He has been shamed in

the community, which is tight-knit, and where he has openly acknowledged his dishonest conduct.”).

Second, Mr. Miller has been sober now for nearly four years. A few months after Mr. Miller admitted to Mr. Silverberg that he had embezzled money from the trust, and recognizing that he was “ashamed of what [he had] bec[o]me,” Edward Miller Letter, Mr. Miller went back to AA. Since that time, in December 2022, he has not had a drink. [redacted], who is now Mr. Miller’s AA sponsor, met Mr. Miller “approximately 4 years ago when he began attending an online meeting of a group which I regularly attend.” Ex. D. At that time, “it was readily apparent that he was severely impaired, mentally,” and “he exhibited many of the characteristics associated with an active alcoholic. Delusional, irrational, obsessive, and self-centered to the extreme.” *Id.* But Mr. Miller “had a strong desire to get sober,” and “kept coming to the meetings and continued reaching out for help. He would often call me to talk about the chaos that was going on in his life and the accompanying pain and anguish he was feeling.” *Id.*

Eventually, Mr. Miller asked [redacted] “to be his sponsor and to help him work the twelve steps.” During his time at AA, Mr. Miller “has put in the work,” which “requires an unflinching examination of the past.” Mr. Miller “has performed this self-examination with rigorous honesty.” *Id. See* Pierre Miller Letter, Ex. L (“My father has become intensely involved in AA.”). Notably, [redacted] tells the Court that of “all the things [Mr. Miller] regretted having done in his life, this crime

was at the top of the list. He deeply regrets what he did, the breach of trust, and all the trouble he has caused to the victims." Ex. D.

Mr. Miller, who attends AA meetings several times a week, "has chaired meeting and reached out to help newcomers" and "performs service work both inside and outside the rooms of AA." *Id.* Mr. Miller, for example, spends his Thursday afternoons working with a charitable organization called *Tomche Shabbas* delivering boxes of food to people in need. *See* Pierre Miller Letter, Ex. L ("on Thursday nights" Mr. Miller "deliver[s] food packages to poor families"). *See also, e.g.,* Juda Klein Letter, Ex. G. He has also become a [redacted]. Ex. V. In [redacted] estimation, Mr. Miller has undergone "a transformation. … He has become rational and calm. He has genuine remorse for the wrongs he has done to others and has made, and continues to make, amends. Edward has a sincere desire to change and is changing." Ex. D.

Third, Mr. Miller has also finally addressed his [redacted] *See* PSR ¶70. In particular, once he stopped drinking, it became easier to find the right combination of medicines to properly control it. *See* [redacted] and Alcoholism, Susan Sonne and Kathleen Brady (2022), *available* at [redacted] and Alcoholism - PMC ("Alcohol use may worsen the clinical course of [redacted], making it harder to treat.").His current psychiatrist writes that "[f]rom 2023 through 2026, [redacted]" Dr. Gupta Letter, Ex. Z. During that period, [redacted]

[redacted] for Mr. Miller. *See id.*; PSR ¶70. As Mr. Miller explains, the current medicinal "combination works. For the first time in my life, [redacted]. It is a night-and-day difference. Life is so much better, even with what's going on." Edward Miller Letter.

In short, Mr. Miller has "change[d] in these past three or four years," by "seriously confront[ing] his alcoholism and [redacted]." Pierre Miller Letter, Ex. L. Pierre has been able to see the change: he has not "heard [his] father raise his voice in years," has "watched him calm down and leave behind so many of the behaviors that caused such pain in our family," and "see[s] the difference in our everyday lives." *Id. See also* Susan Miller Letter, Ex. A ("Around four years ago, Eddie went back to AA. He goes to several meetings a week. This time he actually addressed [redacted] Between not drinking and getting proper medication, Eddie has really improved.").

Ultimately, Mr. Miller is grateful that his sobriety and properly managing his bipolar disorder has given him a "second chance at life," and the opportunity to build "a stable, decent relationship with my older son," and "to be a big part of [his] grandchildren's lives." Edward Miller Letter. He is committed to continuing to make "amends for those I've harmed." *Id.*

### D. Mr. Miller has Suffered, and Will Continue to Suffer, Real Consequences from His Crime

Finally, Mr. Miller will suffer real and serious collateral consequences from his crime, which will provide a deterrent effect, as discussed further below, Sec. V, and undercut the need for an incarceratory sentence in this case.

First, Mr. Miller's conviction will result in the loss of his law licenses. When Mr. Miller pleaded guilty, he contacted the New York State Bar and informed them of his guilty plea. PSR ¶82. While he has not yet been disbarred, we believe that to be a mere formality, as the New York State Bar waits for there to be a judgment of conviction to do so. The Ohio State Bar, where Mr. Miller was also admitted, has reached out and Mr. Miller is in the process of surrendering that law license. Given Mr. Miller's age, 71, this is a serious consequence, as he is too old to find another profession.

Second, Mr. Miller will also all but assuredly lose his house. In order to pay back the trust, Mr. Miller and his wife re-financed their house with a very substantial mortgage, which left them with a monthly mortgage payment of $12,980. PSR ¶84. Given that Mr. Miller can no longer work as a lawyer, and Mrs. Miller does not work, they will be unable to keep paying the mortgage much longer. In fact, the monthly mortgage, standing alone, is more than the current monthly income of him and his wife combined, including social security. *See id.* Recognizing this reality, the Millers have begun showing the house to prospective buyers.

## V. A PROBATIONARY SENTENCE IS "SUFFICIENT BUT NOT GREATER THAN NECESSARY" IN THIS CASE

We respectfully submit, for the reasons discussed below, that the appropriate sentence in this case is a probationary one, along with the special condition of a term of home confinement.

First, there is no need for specific deterrence, as Mr. Miller is exceedingly unlikely to recidivate. Not only has Mr. Miller made full restitution and shown true contrition for his crime, but according to the United States Sentencing Commission, offenders like Mr. Miller are among the least likely to recidivate for at least three reasons. One, he has zero criminal history points, *see* Report At A Glance: Recidivism And Federal Sentencing Policy, Appendix A-1 (Offenders with zero criminal history points were the least likely to be re-arrested); two, because his crime of conviction was fraud-related, *see id.* ("Fraud" having the lowest rearrest rate by "federal offense type"); and three, because he is older than 60 years old. *See Id.* ("Studies have repeatedly shown older offenders to have a lower risk of reoffending" and "[j]ust 16.0% of offenders older than 60 years of age at the time of release were rearrested.").

Second, the need for general deterrence, *see* §3553(a)(2)(B), does not require an incarceratory sentence in this case—as courts have recognized that general deterrence can be achieved without sending a defendant to prison. *See, e.g., United States v. McCarthy*, 22-cr-491-NRM, 2023 U.S. Dist. LEXIS 93832, at *7-9 (E.D.N.Y. May 30, 2023) (explaining that the "goals of general deterrence" were served where "the offense has had a ruinous impact" on the defendant's life, by causing him to "los[e] his business that he spent his career working to build" and being "subject to a very significant financial penalty"). Here, beyond the stigma of his conviction, Mr. Miller will lose his law license (and thus his livelihood) and will most probably lose

his house—substantial consequences that would dissuade others from engaging in similar conduct.

Moreover, in *United States v. Gardellini*, 545 F. 3d 1089, 1095 (D.C. Cir. 2008), then-Judge Kavanaugh rejected, for two reasons, the government's contention that the need for general deterrence necessarily meant that a custodial sentence was required. One, he held that general deterrence is just "one §3553(a) factor" that cannot be "elevate[d] … above all others." Rather, "the district court at sentencing must consider and balance a number of factors—not all of which will point in the same direction." *Id.* Two, he explained that merely because one defendant did not receive a term of imprisonment, "the next similarly situated [] offender cannot expect the same treatment," and "only a fool would think that he or she necessarily would receive the same sentence." *Id.*

Here, a probationary sentence for an offender like Mr. Miller, who is over 70 years old and facing numerous medical issues, and who will lose his law license as a result of his conduct, would not undercut deterrence on other potential offenders.

Third, a probationary sentence, particularly one with a term of home confinement, is a real punishment that would be sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2)(A). *See United States v. Leitch*, 2013 U.S. Dist. LEXIS 27796, at *12 (E.D.N.Y. Feb. 28, 2013) ("[I]t bears emphasis that when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but

both are punishment."). And while "custodial sentences are qualitatively more severe than probationary sentences, … [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48–49 (2007). Probation is "not granted out of a spirit of leniency," *id.* at 48 n.4, as "[i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (quotation marks omitted). This is particularly true when the term of probation includes a special condition of home confinement. *See generally* U.S.S.G Staff Discussion Paper, Sentencing Options under the Guidelines, p. 20, *available* at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/workinggroup reports/simplification/SENTOPT.pdf ("The evidence to date indicates that home confinement may be a viable intermediate sanction[.]").

Many years ago, Charles Dickens wrote that "Prison-doors should be barred on the outside, no less heavily and carefully than they are barred within." The Pickwick Papers, Preface to the 1867 Edition. While Dickens may not be a legal authority, it is undoubtedly true that it is as equally important not to incarcerate those who can be adequately punished, deterred, and rehabilitated using alternative methods as it is to incarcerate people for whom prison is necessary. *See generally* 28 U.S.C. § 994(j); *cf. Leitch*, 2013 U.S. Dist. LEXIS 27796, at *9 ("But there is a substantial segment of our prison population that need not have been sent

to prison at all[.]"). And Mr. Miller, we respectfully submit, is someone who can be "sufficient[ly]," § 3553(a)(2), punished and deterred through probationary methods.

* * *

"The sentencing of defendants in federal court is such a common occurrence that it is important to occasionally pause and remember what is at stake. A human life, designed both by nature and our nation's Constitution to live free and pursue happiness, is taken away from family and familiar surroundings to serve days, months, years, or a lifetime in a prison cell." *United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, *2-3 (D. Md. Feb. 18, 2020). That "sensitive, and difficult, task," *Adelson*, 441 F. Supp.2d at 515, is, unfortunately, Your Honor's responsibility. But because, for the defendant, "every day, month and year that [i]s added to the ultimate sentence will matter," it is "crucial that judges give careful consideration to every minute that is added to a defendant's sentence." *Faison, 2020 U.S. Dist. LEXIS 27643, *3*. Here, for all the reasons discussed above, we submit that the Court should impose a probationary sentence.

## CONCLUSION

We respectfully ask that the Court sentence Mr. Miller to a term of probation, with a special condition of a term of home confinement, which we submit is sufficient but not greater than necessary to accomplish the goals of the federal sentencing regime.

Respectfully submitted,

EDWARD MILLER
DEFENDANT

By: */s/ Stanley A. Twardy, Jr.*
Stanley A. Twardy, Jr. (ct05096)
Day Pitney LLP
One Stamford Plaza, 7th Floor
263 Tresser Boulevard
Stamford, CT 06901
(203) 977-7300
satwardy@daypitney.com

Gedalia M. Stern (ct31314)
NechelesLaw LLP
1120 6th Ave, 4th Floor
New York, NY 10036
(212) 997-7400
gstern@necheleslaw.com